IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JASMINE BRIENO, as Personal
Representative of the Estate of
EDUARDO RODRIGUEZ
MELENDEZ, JR.,

        Plaintiff,

       v.                                       Civ. No. 17-867 SCY/JFR

PACCAR, INC., KIMBLE
MANUFACTURING COMPANY, a
Division of Hines Specialty Vehicle
Group, and JACKIE D. SIMPSON,

        Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**[1]

      Defendant Jackie Simpson was towing a trailer behind a pickup truck on a New Mexico

highway. Somehow, the trailer become unhitched, drifted into the path of oncoming traffic, and

caused a cement truck to swerve to avoid it. The accident resulted in tragedy: the cement truck

rolled over and the driver died at the scene. Plaintiff, the personal representative of the cement

truck driver's estate, brings suit against Defendant Simpson and Defendant Paccar Inc., a

company that manufactured the cement truck's cab, chassis and roof structure. Defendant

Simpson now moves for summary judgment on the question of whether he negligently attached

the hitch of his camper to his pickup truck, failed to keep a proper lookout, failed to stay alert, or

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 27-31.

failed to operate his vehicle in a reasonably prudent manner. Doc. 134. Because the Court concludes that the doctrine of res ipsa loquitur applies to this case, the Court denies the motion as to Simpson's negligence. But because negligence is not a sufficient basis to impose punitive damages, the Court grants the motion with respect to Plaintiff's claim for punitive damages.

## FACTS

On July 29, 2014, the decedent, Eduardo Rodrigues Melendez, Jr. was driving his work vehicle, a 2006 Kenworth day cab cement truck, northbound on U.S. Highway 54 in Lincoln County, New Mexico. Defendant Simpson's Undisputed Material Fact ("UMF") No. 1.[2] Defendant Jackie D. Simpson was driving his 1996 Ford pickup towing a 1974 Avion camper southbound on U.S. Highway 54. UMF No. 2. Simpson is a resident of Columbia, Kentucky. UMF No. 3. Simpson has a class A driver's license to drive anything from a 1-ton and 2-ton truck, "all the way up to the big load boys." *Id.* He is qualified to drive a class A tractor pulling trailers up to 80,000 pounds. *Id.* He also has a HAZMAT endorsement and has been a fuel truck driver. *Id.* Simpson is a truck driver in the teamster's craft. UMF No. 4. He hauls heavy equipment and pipes. *Id.* At times the union will send him to various jobs, and at times he is called to a job from an old foreman who wants him to come back and work for him again. *Id.* When taking jobs away from Kentucky, Simpson pulls his camper and lives in the camper on the job. UMF No. 5. Prior to July 29, 2014, Simpson had been working on a pipeline job in Wheeling, West Virginia for Sheehan for approximately three weeks. UMF No. 6. He received a phone call from another company, Price Gregory, for a job in Tucson, Arizona. *Id.* Simpson received the phone call on Friday, and he left for Tucson mid-morning on Sunday, July 27, 2014.

---

[2] Defendant Simpson's UMFs are set forth in Doc. 134 at 2-8 and are undisputed unless otherwise noted.

*Id.* Simpson was not in a hurry to travel from West Virginia to Arizona, and he did not have to be in Tucson by a particular day. UMF No. 8.

Simpson was towing his 1974 Avion camper/trailer. UMF No. 9. The camper was a small to medium size camper, about 26 feet long. *Id.* Simpson purchased the camper to have a place to stay when he traveled around for his various jobs. UMF No. 10. He believes he purchased the camper in 2002 or 2003. *Id.* When he purchased the camper, he did not have any issues or problems that he had to fix. *Id.* In his deposition, Simpson could not recall exactly when he'd purchased new tires for the trailer, but it was within the past year, and he thought he had arrived in West Virginia with new tires. Doc. 139 at 66-68. The hitch on the camper/trailer is a stock ball hitch. UMF No. 11. The ball hitch has not been modified. *Id.* Simpson's pickup truck has a class 4 receiver that received the ball hitch. UMF No. 12. The receiver was on the truck when Simpson purchased the truck. *Id.* Simpson had a single ball on the slide that slides into the receiver. *Id.* There are two pins. UMF No. 13. The hairpin cotter pin holds another 5/8 pin that keeps the male and female portions of the hitch together. *Id.*

The parties agree that, for the trip in question, Simpson travelled from West Virginia on Route 70 through Ohio, Indiana, St. Louis, south on Interstate 44, into Oklahoma, and across the panhandle of Texas. UMF No. 21. He took Interstate 40 into New Mexico and then U.S. Highway 54 south. *Id.* Simpson pulled his camper, so he could simply pull over and rest if he got tired. UMF No. 22. Simpson spent the night of July 27th in Missouri and the night of July 28th somewhere in Texas at a rest stop off of Interstate 40. UMF No. 24. He believes he left Texas early in the morning of July 29th around 6:00 or 7:00 am. UMF No. 25. Prior to the accident, Simpson traveled approximately 1600 miles or approximately two-thirds of his trip without any problems. UMF No. 31. At approximately mile marker post 112 on U.S. Highway 54 in New

Mexico, Simpson's camper completely detached from his pickup truck and traveled into the path of Melendez' cement truck. UMF No. 33. As Melendez steered to avoid the camper, his truck tipped over onto the driver's side and roof of the cab and slid 129 feet. UMF No. 37. Melendez died at the scene of the accident. UMF No. 38. Simpson was cited for equipment failure, and he paid the fine. UMF No. 41.

The following facts are disputed. Simpson testified that he didn't have any issues with the ball hitch on the trailer, UMF No. 11, but Defendant Paccar disputes this fact, pointing out that there was clearly an issue with the hitch because it failed on the date of the crash. Doc. 134 at 26; Doc. 140 at 2 (citing Doc. 139 at 21). According to Simpson's deposition testimony, he hitched the camper to his truck on the morning of July 27, 2014 in Wheeling, West Virginia. UMF No. 14. He grabbed the slide underneath the trailer that had the ball on it. *Id.* He slid the ball into the receiver, took the pin, lined up the holes and secured it with the accompanying cotter pin that holds it in. *Id.* The pin that went through the receiver and the slide to connect them has a hole drilled through it. UMF No. 15. That is where you put the cotter pin. *Id.* Simpson put the cotter pin in the pin on the morning of July 27th. *Id.*

The cotter pin was the kind sold by the manufacturer. UMF No. 16. It slides into the receiver, and there is an indentation that secures it. *Id.* Simpson has been around cotter pins "all [his] life." *Id.* He has never known of a cotter pin to come out, unless intentionally removed. *Id.* If the pin is in place and intact, the camper/trailer will not detach. *Id.* Simpson was certain he used the right pin. UMF No. 17. Simpson did not know how old the pin was, but his best estimate was a year or two. UNM No. 18. Simpson also hooked his safety chains from the camper to his truck. UMF No. 19. The safety chains were galvanized and were not rusty. *Id.* At one end, the safety chains were permanently bolted to the tongue of his camper. *Id.* At the other

end, the safety chains were hooked and connected to his pickup truck with heavy duty "S" hooks. *Id.* There were two chains and two "S" hooks connected to a slot designed into the receiver hitch of the pickup truck. *Id.*

Simpson testified he is certain he attached the weight distribution bars and the safety chains were attached prior to the accident, because he saw them. *Id.* Simpson also had the seven pin trailer light wiring harness connection from the camper to the truck, and the load equalizer bars were connected to the pickup truck and camper. UMF No. 20. Simpson did not unhitch the camper at any time during his trip. UMF No. 23. He did not remove the cotter pin at any time after he hitched the truck on July 27, 2014. *Id.* He left the safety chains attached during the trip. *Id.* He left the tongue, the locking device and the tongue on the ball in place. *Id.* Simpson checked the pins the morning of the accident. UMF No. 26. He has a list of things he routinely checks during a trip when he is pulling his camper. *Id.* He checks to see if the safety chains are dragging. *Id.* He checks to see if he has a low tire. *Id.* He checks the hitch pins. *Id.* He checks his lights. *Id.* Simpson had a little trouble with his lights flickering and he corrected that problem. *Id.*

When he is traveling, Simpson routinely checks the pins and the equipment on his vehicles in the mornings whenever he takes off and usually when he gassed up at a gas station. UMF No. 27. Every time he walked around the truck, he looked at the hairpin cotter pin and the 5/8 pin. *Id.* Simpson had a habit of checking the pins. UMF No. 28. He never failed to check the pins. *Id.* Simpson has a specific memory of looking at the hairpin cotter pin and 5/8 pin on the morning of July 29th. *Id.* Each time he performed his visual inspection of the truck and camper, Simpson saw the hairpin and the 5/8 pin. UMF No. 29. He also checked the locking device as part of his walk around. *Id.* He stopped for gas that day, but cannot recall if he stopped more than

once. UMF No. 30. He knows he checked his equipment, but he does not recall if he checked when he left Texas or when he got gas. *Id.*

Defendant Paccar and Plaintiff both dispute this testimony. They admit they do not have direct contradictory evidence, but argue that the circumstantial evidence demonstrates that Simpson must have been negligent in his actions leading up to the accident and a reasonable jury could disbelieve Simpson's explanation of his actions leading up to the accident. As Plaintiff argues, "[t]he trailer connection was always under the control of Mr. Simpson and the fact that the trailer came off, which normally does not occur in the absence of negligence, is enough evidence for the jury to infer negligence." Doc. 139 at 3. Defendant Paccar points out that only Simpson had control of his pickup truck and trailer, and that the accident itself is evidence that he hitched the trailer to his truck negligently and used the "S" hooks improperly. Doc. 140 at 3-4 (citing testimony from Plaintiff's crash reconstruction expert, Jeff Vick). In addition, Agent Steven Chavez—who was Officer Chavez at the time of the crash and investigated the crash for the New Mexico State Police—testified that Simpson's statements were not consistent with the witness testimony or the evidence at the scene. Doc. 139 at 3 (citing Doc. 139 at 52-54). Officer Chavez testified that he believed the pins Simpson claims he used to secure the trailer to his pickup broke, because he could not find the pins at the scene and the fact was that the trailer *did* detach from the pickup before the accident. Doc. 140 at 4-5 (citing 140-2 at 8).

The parties also dispute the events of the accident itself. According to Simpson's deposition testimony, the speed limit on U.S. Highway 54 is 65 mph and he was traveling approximately 55 mph. UMF No. 32. He was not distracted in any manner; neither listening to the radio nor talking on the telephone. *Id.* Prior to the detachment and accident, Simpson never felt the camper dragging. UMF No. 34. He never saw sparks behind his truck. *Id.* As Simpson

was driving, he heard a thump or thud and later learned the noise was the tongue of the trailer slamming against the asphalt. UMF No. 35. He knew something was wrong, and he knew he had to stop. *Id.* He was in the process of putting on his brakes and moving to the shoulder. *Id.* He did not know at that time that his camper had separated from his truck. *Id.* As Simpson started to slow down, he saw Melendez's truck starting to get into his lane towards him. UMF No. 36. He slammed on the brakes, steered to the right and came to a stop. *Id.* Simpson did not realize his camper/trailer was unhitched until he stopped. *Id.* These events transpired in a matter of not over three or four or five seconds. *Id.*

According to Simpson's testimony, something happened that caused the camper to detach from Simpson's truck. UMF No. 39. Simpson does not know what happened to the pin and cotter pin, because the pins were never found after the accident. *Id.* No one found the-5/8 pin. *Id.* Other than the missing pins, Simpson cannot identify any other cause for the camper to separate from the truck. *Id.* Without a pin, the camper "wouldn't go 5 feet until the truck and trailer separated from each other." *Id.* One end of each safety chain was still attached to the pickup truck with the "S" hooks. UMF No. 40. The other end of each safety chain was still bolted onto the tongue of the trailer. *Id.* The safety chains broke in between or somewhere in the middle. *Id.* Simpson does not believe the chains were too old, and he does not know why the safety chains did not do their job. *Id.*

Officer Chavez testified that he does not know how the camper became detached or specifically what piece of equipment failed. Doc. 146 at 23. The parties dispute whether Officer Chavez agreed with Simpson that the safety chains snapped, or whether the chains stretched out such that the S-hooks on the end of the safety chains were bent straight. *E.g.* Doc. 139 at 5; Doc. 145 at 11. After reviewing the relevant pages of Officer Chavez's deposition testimony, the

Court finds his testimony ambiguous. *See* Doc. 145 at 24-25 (Chavez Dep. at 145:19-147:3). This dispute of fact is, in any event, not material at present because there is no dispute that some feature of the safety chain broke. Further, although how long the safety chains should be expected to last once the trailer becomes unhitched might become an issue at some point, it is not at issue now.

According to witness testimony, before the slide came out of the receiver, the trailer was swaying, or fishtailing, from side to side for several seconds. Doc. 139 at 4. An eyewitness, Mario Salcido, testified that he had just completed passing the cement mixer and was a couple hundred yards away from Simpson's pickup at the time of the accident. Doc. 139 at 16-17. Salcido realized something was wrong the minute he saw the pickup and trailer. *Id.* at 17. He testified that the trailer was "moving pretty good," by which he meant that it was fishtailing. *Id.* It fishtailed for three to five seconds, still on the hitch. *Id.* at 18. Then, he saw the trailer "change levels" and fall. *Id.* at 17-18. The front end of the trailer dropped lower than the rear end of the pickup truck, the trailer came off, and Salcido saw sparks. *Id.* at 19. The trailer stayed in the southbound lane for a few seconds, then drifted into Salcido's lane. *Id.* at 20. A second eyewitness, Robert Sturtz, testified that the pickup truck driver did "nothing." Doc. 139 at 35-36. Sturtz did not even know if the pickup truck driver knew he had lost the trailer. *Id.* at 36. "He just went by . . . . [H]e didn't do anything." *Id.*

Plaintiff's crash reconstruction expert, Jeff Vick, testified that Simpson should have known something was wrong with his trailer as he was driving, and should have felt a jerking motion or other "noticeable event" involving the safety chains and hitch. Doc. 140 at 6-7 (citing Doc. 140-1 at 5-6). He should have stopped his pickup and controlled the situation as much as possible; testimony indicating that the trailer was moving problematically over several seconds

indicates Simpson had time to be aware of it and attempt to gain control of the situation, yet he did nothing. Doc. 140 at 8 (citing Doc. 140-1 at 7). Officer Chavez issued a citation to Simpson for unsafe equipment in violation of NMSA § 66-3-801 based on the trailer detachment. Doc. 140 at 9; Doc. 145 at 3. Simpson pleaded guilty to the charge and paid a fine. *Id.*

## STANDARD OF REVIEW

 "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## DISCUSSION

Defendant Simpson moves for summary judgment, arguing that the undisputed facts show that Simpson was not negligent in his actions leading up to the accident. In response,

Plaintiff and Defendant Paccar make three separate arguments concerning Simpson's negligence: (1) Simpson can be held negligent under the doctrine of res ipsa loquitur; (2) there is a dispute of fact over whether Simpson had sufficient time to notice something was wrong and take action to control the situation; and (3) Simpson can be considered negligent under the doctrine of negligence per se. Finally, Simpson moves for summary judgment on Plaintiff's claim for punitive damages. The Court considers each issue in turn.

**I.      The Doctrine Of Res Ipsa Loquitur Applies.**

"The doctrine of res ipsa loquitur applies only when evidence establishes that in the ordinary course of events an injury would not occur except through negligence of the person in exclusive control and management of the injuring instrumentality." *Trujeque v. Serv. Merch. Co.*, 1994-NMSC-036, ¶ 6, 117 N.M. 388, 391. "Generally, cases in which the theory of res ipsa loquitur is presented fall into two categories: those in which the defendant directly uses an instrumentality so as to cause injury, and those in which the defendant is in charge of, created, or last controlled an instrumentality that inexplicably becomes dangerous and injures the victim outside of the defendant's presence." *Id.* (citations omitted). "In order to make a prima facie case from which the jury may infer that the defendant is liable for the damages caused by the instrumentality outside of the defendant's presence, the plaintiff must provide evidence of the character of the occurrence and of the exclusive control of the defendant." *Id.* ¶ 7. Once the plaintiff establishes "that an accident occurred that normally does not occur absent negligence" and that the defendant "owned, maintained, and provided" the instrumentality of the injury, the plaintiff satisfies "her burden of making a prima facie case from which the jury could infer negligence." *Id.* ¶ 11. The defendant can "then choose to present no evidence or choose to rebut the inference by offering evidence that a latent manufacturing defect was the cause" of the injury "or perhaps that some third party bore responsibility" for the injury. *Id.*

10

The parties do not dispute that the trailer hitch mechanism was under Simpson's exclusive control and management. Instead, Simpson argues that "[t]he mere happening of this accident is not evidence that Mr. Simpson was negligent." Doc. 134 at 12. Although this is a true statement of law, it does not vitiate application of the doctrine of res ipsa loquitur. Specifically, this statement does not address whether Plaintiff has satisfied her prima facie burden of establishing that the doctrine of res ipsa loquitur applies. In other words, Plaintiff is not relying on the mere fact of an accident; she is relying on the theory that the mechanism of injury was under the exclusive control of Simpson, and that the injury ordinarily would not have occurred absent negligence.

Simpson relies on state-law cases in which the doctrine of res ipsa loquitur is not mentioned, much less explored in detail. Doc. 134 at 12-14 (citing *Lovato v. Plateau, Inc.*, 1968-NMCA-060, 79 N.M. 428; and *Paquin v. Echeverria*, 1981-NMSC-020, 95 N.M. 473). While Simpson correctly characterizes these cases as rejecting the notion that the mere fact of an injury establishes negligence, they do not address Plaintiff's theory raised in this case.

More useful to the Court's analysis is *Harless v. Ewing*, 1970-NMCA-059, 81 N.M. 541. The plaintiff in that case was injured after a wheel came off a truck. *Id.* ¶ 7. The issue at trial was whether the wheel came off as a result of the defendant's negligence. *Id.* ¶¶ 9-11. The court noted on appeal that "[t]he essence of defendant's claim is that the trial court should have decided the issue of applicability of the doctrine [of res ipsa loquitur] as a matter of law and should not have permitted the doctrine to be considered by the jury." *Id.* ¶ 29. The New Mexico Court of Appeals rejected this argument, affirmed the district court's res ipsa loquitur instruction to the jury, and upheld the verdict in favor of the plaintiff. *Id.* ¶¶ 1, 12-29.

Citing paragraph 20 of the opinion, Defendant Simpson argues *Harless* is distinguishable because in that case "there were conflicting inferences that could be drawn from the evidence. The wheel could have come off the truck without defendant's negligence, or the wheel would not have come off if it had been properly tightened or maintained." Doc. 146 at 3. In other words, one possible inference was that the wheel came off *in the absence* of the defendant's negligence and another possible inference was that the wheel came off *because of* the defendant's negligence (not properly tightening or maintaining the wheel). After recognizing these two potential inferences, the court stated, "defendant would have us weigh the evidence on appeal, would have us decide which inference should be drawn. But we do not do this. Plaintiff had to prove each of the facts on which to apply the doctrine." *Harless*, 1970-NMCA-059, ¶ 20. Thus, the court held, Plaintiff, having asserted res ipsa loquitur, carried the burden at trial to present evidence regarding the elements of res ipsa loquitur and then "[i]t was for the jury to determine whether those elements, including the element here in question [the accident was one that ordinarily doesn't happen in the absence of negligence by the person having control], have been proved." *Id.*

Rather than demonstrating how *Harless* is distinguishable from the present case, however, paragraph 20 of that opinion demonstrates how similar *Harless* is to the present case. Similar to the wheel coming off in *Harless*, and drawing all reasonable inferences in favor of the non-moving party, a reasonable jury in the present case could infer that the trailer came off in the absence of Simpson's negligence or it could infer that the trailer came off because of Simpson's negligence. Following *Harless*, resolution of these "conflicting inferences" is for the jury, not the Court. *See Harless*, 1970-NMCA-059, ¶ 25 ("Certainly we cannot say as a matter of law what caused the wheels to come off. Was it because the truck driver failed to tighten the wheels? Was

it because there was dirt in the wheel that did not permit the wheel to be tightened? Was it because the wheels loosened on rough roads and there was insufficient checking for this condition? Was it some other cause? We do not know. Since we do not know the true cause, the evidence does not dispel an inference of negligence under the doctrine.").

Defendant Simpson next argues that "[n]o facts or admissible evidence lead to a reasonable inference Mr. Simpson was negligent." Doc. 146 at 4. Defendant Simpson's insistence that Plaintiff show some direct evidence of his negligence, however, misapprehends the nature of the doctrine of res ipsa loquitur, Latin for "the thing speaks for itself." Success under the doctrine is not dependent on evidence outside the "thing." Instead, "[t]he factual basis necessary as a premise for application of res ipsa loquitur requires proof that (1) plaintiff's injury was proximately caused by an agency or instrumentality under the exclusive control of the defendant; and (2) the incident causing the injury is of the kind which ordinarily does not occur in the absence of negligence by the person having control of the instrumentality." *Hisey v. Cashway Supermarkets, Inc.*, 1967-NMSC-081, ¶ 4, 77 N.M. 638, 640. Because *Harless* tells us that the existence of these elements is a matter for the jury rather than the court, the Court in this case could only grant Defendant Simpson's motion for summary judgment if it decided that no reasonable jury could conclude from the facts that this incident is the kind which ordinarily does not occur in the absence of negligence by the person having control of the instrumentality. But the Court finds the opposite: a reasonable jury could conclude that the trailer coming unhitched would not ordinarily occur in the absence of negligence on the part of the person who controlled the trailer—here, Simpson.

Finally, Simpson emphasizes that "Plaintiff has not shown Mr. Melendez's injury could not have happened but for Mr. Simpson's negligence." Doc. 146 at 4. But the doctrine of res ipsa

loquitur does not place the burden of doing so on Plaintiff. The question for the jury is not whether the injury "*could not* have happened *but for*"; instead, the question is whether the injury *would not ordinarily* occur *in the absence* of Mr. Simpson's negligence. Because a reasonable jury could find that the unhitching in this case is the type that would not *ordinarily* occur in the absence of negligence on the part of the person in control of the hitching, and because all reasonable inferences must be drawn in favor of the non-moving parties at this point, Defendant Simpson's motion for summary judgment cannot succeed.

Moreover, under *Trujeque*, it is the defendant's burden to establish alternate causes once the plaintiff has put forth a prima facie case of res ipsa loquitur. 1994-NMSC-036, ¶ 11. Defendant Simpson has not done so in his motion. Instead, he argues that the cause of the accident is simply unknown. Doc. 146 at 4 ("the evidence shows the accident was caused by unforeseeable equipment failure of an unknown cause"). In arguing that he need not establish alternate causes, Simpson relies on the unpublished case of *Nez v. Gallup-McKinley Public Schools*, No. 31,728, 2014 WL 1314937 (N.M. Ct. App. Feb. 17, 2014). *See* Doc. 146 at 4 (citing *Nez*). In that case, the plaintiffs' son "was born with a very rare, progressive neurological condition." 2014 WL 1314937, ¶ 2. As a consequence, "he suffered from severe osteoporosis"— weakened bones. *Id.* While at school, the child suffered a spinal fracture of his left leg. *Id.* ¶ 3. He was hospitalized, where his condition worsened. *Id.* ¶ 5. He spent a month in a coma, never fully recovered, and eventually passed away. *Id.* The district court determined that the doctrine of res ipsa loquitur did not apply with respect to the school's handling of the child on the day he suffered the fracture. Instead, the court found that "due to the very weak state of [the child's] bones, Darnell was subject to fracture, including spiral fracture, from virtually any routine non-negligent handling." *Id.* ¶¶ 6, 25. The district court declined to draw an inference of negligence,

and proceeded to hold a bench trial. *Id.* ¶ 25. The court of appeals affirmed, noting expert

testimony that *any* care maneuver, even a non-negligent one, ran the risk of fracture given the

child's condition. *Id.* ¶¶ 22-25.

Comparing the fragile bones of the child in *Nez* to the hitch set-up in this case only

weakens Simpson's position. If Simpson knew the hitch set-up was so fragile that it would likely

break, regardless of how he handled it, his mere use of this hitch set-up would be negligent.

Simpson's position, however, is that every aspect of the hitch set-up appeared to be in working

order. Thus, unlike the fragile bones in *Nez*, which ordinarily could break in the absence of

negligence, a reasonable jury could conclude that the trailer in this case would not have become

detached absent negligence on the part of the person in charge of maintaining and attaching the

trailer. As discussed above, Defendant Simpson offers no evidence, much less undisputed

evidence, of any other possible cause of the accident.

## II.     Whether Simpson Had Time To React Before The Trailer Detached Depends On Resolution Of Issues Not Fully Briefed, So The Court Does Not Currently Decide These Issues.

Plaintiff and Defendant Paccar argue that, contrary to Simpson's testimony that he had no

time to react—i.e., to brake and slow down—before his trailer detached, the eyewitness

testimony establishes that he had 3 to 5 seconds in which to do so. As described above,

eyewitness Mario Salcido testified that before the slide came out of the receiver, the trailer was

swaying, or fishtailing, from side to side for several seconds. In addition, eyewitness Robert

Sturtz testified that, even after the trailer detached, Simpson did nothing; Sturtz did not even

know if Simpson realized he had lost the trailer.

In contrast, based on his own deposition testimony, Simpson proposes as an undisputed

material fact that "[p]rior to the detachment and accident, Mr. Simpson never felt the camper

dragging. He never saw sparks behind his truck." Doc. 134 at 7. Simpson testified that "there

[wa]s not a fraction of a second different" between driving normally, the sound of the trailer hitch thumping on the ground, and the feel of the safety chains breaking. Doc. 134 at 32-33. Similarly, in a line of questioning related to Salcido and Sturtz's testimony, Simpson was asked, "At any time before you heard the thud and felt the feeling in the seat of your pants, did you feel the trailer dragging at all?" Doc. 134 at 39. Simpson responded, "None whatsoever. No, no." *Id*. Thus, contrary to the testimony of the two eyewitnesses, Simpson testifies that he was not driving in a distracted manner and that he had no time to react because the trailer detached so suddenly. Because all reasonable factual inferences must be drawn in favor of the non-moving party, for purposes of this Opinion, the Court adopts the testimony of the eyewitnesses rather than the testimony of Simpson.

But even adopting this testimony, Simpson argues, 3-5 seconds is not a reasonable period of reaction time. Doc. 146 at 5-6, 8. In other words, according to Simpson, this dispute of fact is not material. This is where Plaintiff's accident reconstruction expert, Jeff Vick, comes in. Vick opines that Simpson should have known something was wrong with his trailer as he was driving and should have felt a jerking motion or other "noticeable event" involving the safety chains and hitch. Thus, Vick concludes, Simpson should have "done his best to bring the vehicle to a stop" and "control the situation as best he could." Doc. 140-1 at 7. Drawing all reasonable inferences in favor of the non-moving party, a reasonable jury could conclude from the testimony of the eyewitnesses and expert that the trailer was moving problematically over several seconds, giving Simpson time to be aware of the problem and to attempt to control it; yet, Simpson negligently did nothing.

Simpson argues that he is nonetheless entitled to summary judgment because Plaintiff's expert testimony was outside the scope of his written report. According to Simpson, Vick did not

16

offer an opinion as to Simpson's negligence in his written report. Instead, he offered these opinions during his February 20, 2020 deposition. Doc. 146 at 4-5. Simpson also argues that Vick's opinions amount to legal conclusions that would invade the province of the jury. Doc. 146 at 5 (citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988), which holds that "testimony on ultimate issues of law by the legal expert is inadmissible").

Plaintiff and Paccar have not had an opportunity to address these arguments because Simpson raises them for the first time in reply. Arguments raised for the first time in reply are often considered waived. *See F.D.I.C. v. Noel*, 177 F.3d 911, 915-16 (10th Cir. 1999) (district court properly refused to consider an argument raised for the first time in reply in support of a post-trial motion). This is not the rule, however, when the reply simply addresses arguments raised in the response. *See Sadeghi v. I.N.S.*, 40 F.3d 1139, 1143 (10th Cir. 1994) (considering arguments raised in reply because the appellant was responding to a contention raised in the appellee's brief). Because Simpson's reply addresses arguments made in the responses, the Court concludes Simpson did not waive the arguments he made for the first time in his reply.

Nonetheless, the Court will not resolve these important issues in the absence of full briefing from all sides. Although the Court could order supplemental briefing, the Court finds such briefing unnecessary because it has already denied Simpson's motion for summary judgment on other grounds; namely, res ipsa loquitur. Further, the legal analysis the Court must undergo to resolve these issues can be done more effectively after discovery is completed.

This is because, to resolve Simpson's assertion that Plaintiff sandbagged him by having his expert withhold part of his opinion until his deposition, the Court must consider whether the allegedly late disclosure prejudiced Simpson, whether any prejudice can be cured, and whether Plaintiff's allegedly late disclosure was done willfully or in bad faith. S*ee Jacobsen v. Deseret*

*Book Co.*, 287 F.3d 936, 952-53 (10th Cir. 2002) (violation of Rule 26(a)(2) requirement that expert reports "contain a complete statement of all opinions to be expressed" may be excused under Rule 37(c)(1) if substantially justified or harmless and, in making this determination, the Court should consider: (1) whether the other party will be prejudiced, (2) the ability to cure any prejudice, (3) whether allowing the evidence would disrupt the trial, and (4) the violator's bad faith or willfulness); *see also Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

At this point, the record indicates the parties may have learned about the eyewitness testimony from Sturtz and Salcido *after* Vick completed his report, and not long before Vick's own deposition. That is, Vick's expert report, dated October 2019, does not address the eyewitness testimony from Salcido and Sturtz. But Defendant Paccar deposed Salcido on February 11, 2020, Doc. 146 at 26, and Sturtz on February 12, Doc. 146 at 34. Vick's deposition took place almost immediately afterwards, on February 20. Doc. 146 at 56. This bears on the issue of bad faith: if Vick had no opportunity to incorporate information from Sturtz and Salcido in his report and little opportunity to supplement his report prior to his deposition, Simpson's assertions of sandbagging and bad faith face an uphill climb. Ongoing discovery and further briefing, however, might supplement the current record. The same is true for the issues of whether Simpson was prejudiced and, if he was, whether the prejudice can be cured. In other words, to the extent Vick's opinions were not timely disclosed, any prejudice from such delay, and the effect of any prejudice, could be mitigated by ongoing discovery and supplementation.

Likewise, it is too early to decide whether Vick's testimony should be excluded because it invades the province of the jury. Vick has offered several opinions and the proximity of those opinions to the "ultimate issue of law" varies with each opinion. *See* Doc. 140-1 at 3-9. To

decide whether any of those opinions are excludable as an "ultimate issue of law" the Court will need to analyze each opinion separately, after the parties have an opportunity for full briefing.

Finally, even if the Court were to exclude Vick's testimony, it would have to determine whether the testimony of Sturtz and Salcido alone could establish negligence. The parties have not briefed whether an expert would be needed to allow a jury to conclude from the testimony of Sturtz and Salcido that Simpson should have been aware that the trailer was coming off and that Simpson had time to take action to prevent the accident. Again, the Court will make no findings in the absence of briefing on this issue.

Because the Court denies Simpson's Motion for Summary Judgment based on its above analysis of res ipsa loquitur, the Court need not address whether Vick's testimony is necessary or whether it should be excluded. If, after discovery is completed, Simpson seeks to exclude Vick's testimony, he may file a motion seeking to exclude it.

## III.   The Court Need Not Presently Resolve Whether Negligence Per Se Applies.

Plaintiff argues that Simpson was negligent per se because he was charged with and pled guilty to a violation of N.M.S.A. § 66-3-801, which provides that "it is a penalty assessment misdemeanor for a person to drive or move . . . on any highway any vehicle or combination of vehicles that is in such unsafe condition as to endanger any person . . . ." Doc. 139 at 10-12. To invoke the doctrine of negligence per se,

> (1) there must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent.

*Archibeque v. Homrich*, 1975-NMSC-066, ¶ 15, 88 N.M. 527, 532 (1975).

Plaintiff and Defendant Paccar urge the Court to apply the doctrine of negligence per se in a manner that takes the issues of duty and breach out of the hands of the jury—that is, they

argue that because the statute forbids the operation of unsafe equipment, Simpson's guilty plea means he is negligent as a matter of law. (Of course, the jury would still have to determine actual and proximate causation. *Archibeque*, 1975-NMSC-066, ¶ 17.) In this case, because the Court has denied summary judgment on other grounds, it need not resolve the issue of negligence per se in order to resolve the present motion. Neither Plaintiff nor Defendant Paccar filed cross-motions for summary judgment on the issue, and so the Court does not grant them affirmative relief in the form of adopting the doctrine of negligence per se in a form that would take the issue away from the jury.

## IV.   The Court Grants The Motion With Respect To Punitive Damages.

Simpson also moves for summary judgment on Plaintiff's claim for punitive damages. Doc. 134 at 16-17. To be liable for punitive damages, a tortfeasor must have a culpable mental state. *Paiz v. State Farm Fire & Cas.*, 1994-NMSC-079, ¶ 24, 118 N.M. 203. A mental state sufficient to support an award of punitive damages will exist when the defendant acts with at least "reckless disregard" for the rights of the plaintiff. *Id.* ¶ 26. Since punitive damages are assessed for punishment and not for reparation, a positive element of conscious wrongdoing is always required. *Id.* ¶ 27.

Neither Plaintiff nor Defendant Paccar address Simpson's request for summary judgment on the claim for punitive damages. The doctrine of res ipsa loquitur, as well as the dispute of fact over whether Simpson had time to react to the trailer fishtailing, amount to negligence at the very most, even if resolved in Plaintiff's favor. And although Simpson pled guilty to a misdemeanor for operating unsafe equipment, the statute in question does not specify a mens rea. *See* N.M.S.A. § 66-3-801. Importantly, Plaintiff represents that it is a strict liability statute, requiring no criminal or wrongful intent. Doc. 139 at 11 ("[T]here is no requirement in the statute that the driver or mover of the equipment know that the equipment is in an unsafe condition. Rather, the

20

statute strictly prohibits the conduct."). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Therefore, "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The movant may show an entitlement to summary judgment "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* Simpson has done so here: he has pointed to an absence of evidence of conduct rising above the level of negligence. Therefore, the Court grants Simpson's motion for summary judgment with respect to Plaintiff's claim for punitive damages.

## CONCLUSION

Defendant Jackie D. Simpson's Motion And Memorandum In Support Of Motion For Summary Judgment, Doc. 134, is GRANTED IN PART AND DENIED IN PART. The Court denies the Motion on the issue of negligence, but grants the Motion on the issue of punitive damages.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE